IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL No. 08-27 |
| | : | |
| TERRIL EDWARDS | : | |

**ORDER-MEMORANDUM**

**AND NOW,** this 9th day of September, 2008, upon consideration of Defendant's Motion to Suppress (Docket No. 23), and the Government's response thereto, and after an evidentiary hearing and argument on September 2, 2008, **IT IS HEREBY ORDERED** that the Motion is **DENIED**.

Defendant Terril Edwards has been charged with possession with intent to distribute more than 50 grams of crack cocaine, carrying a firearm during a drug trafficking crime, and felon in possession of a firearm. Presently before the Court is Defendant's Motion to Suppress the firearm and crack cocaine that police officers seized from his person on the date of his arrest.

The following facts were developed at the September 2, 2008 hearing. On June 2, 2007, at approximately 11:15 p.m., two plainclothes Philadelphia police officers, William Seifert and John Calhoun, were patrolling Philadelphia's 6th District in an unmarked vehicle.[1] (N.T. 9/2/08, at 6:3-5; 8:3-8.) The primary law enforcement problems in the Sixth District at the time were robberies, burglaries and quality of life issues, including gambling, prostitution, and public intoxication. (Id. at 46:13-20.) On the evening of June 2, 2007, Officers Seifert and Calhoun were specifically assigned to the 13th Street Corridor to address night-time gunpoint robberies that had been occurring in the area.[2] (Id. at 47:5-9.) The officers had been advised of a local Crime Bulletin that informed police

[1]The bulk of the Sixth District is depicted in Government Exhibit 1. (See Hr'g Ex. G1.)

[2]The 13th Street Corridor is within the Sixth District and generally includes the area from 12th Street to Broad Street, and from Chestnut Street to South Street. (N.T. 9/2/08, at 58:11-14.)

of a team of three robbery suspects, two black males and a black female, who were believed to be involved in two recent robberies, one on May 27, 2007, at 201 South Broad Street, and the other on May 30, 2007, at 5th and Market Streets.[3] (Id. at 48:6-8; Hr'g Ex. G6.)

While driving Northbound on 13th Street, the officers observed Defendant, along with a second black male and a black female, standing on the Northeast corner of 13th and Spruce Streets, looking at individuals passing by. (N.T. 9/2/08, at 7:20-25; 69:15-17.) Believing the threesome to fit the description in the Crime Bulletin, the officers circled the block and next observed the three individuals walking Southbound on 13th Street. (Id. at 8:16-19.) The officers circled the block again and this time observed the threesome continuing down 13th Street, pausing at the corner, and then turning east onto Panama Street. (Id. at 8:19-23; 72:4-6.) According to Officer Calhoun, the threesome was acting suspiciously, "looking up and down in different directions," possibly casing people to rob. (Id. at 48:24 to 49:6; 69:15-25; 72:4-6.) The officers drove around the block a third time and saw the trio on the 300 block of South Camac Street, which is a small residential street. (Id. at 12:9-16; see Hr'g Ex. G4.) Defendant was leaning on a car parked outside 330 South Camac Street, and his two companions were sitting on the steps of the townhouse at that address. (N.T. 9/2/08, at 12:9-16.)

The officers drove down Camac Street and pulled their car adjacent to the car on which Defendant was leaning. (Id. at 14:15-16.) Officer Calhoun "immediately felt something wasn't right." (Hr'g Ex. D3; N.T. 9/2/08, at 61:3-6.) The officers got out of their car and approached the threesome, identifying themselves as police officers and asking if Defendant and his companions

---

[3]The Crime Bulletin's precise descriptions of the three individuals were: Black Female, 35 years old, 5'3", 130 lbs.; Black Male, 38 years old, 5'11", 150 lbs., dark complexion, African accent; and Black Male, 38 years old, 5'11", 200 lbs., dark complexion, afro hair. (Hr'g Ex. G6.)

lived where they were congregating. (Id. at 13:9-13.) The female immediately got irate, acting "very nervous and agitated," and screaming and hollering "at the top of her lungs" things like: "Who are you?" and "Why are you stopping us?" (Id. at 13:13-15; 63:7-10.) Officer Seifert attempted to calm her down but, in the meantime, Defendant also became irate, got on his cell phone and was yelling into his cell phone: "I don't know who these guys are," and "They're stopping me and I don't know why." (Id. at 15:9-14; 17:16-21, 50:20-24.) The female then stood up, and with both she and Defendant irate, the officers decided, for their safety, to ask all three individuals to put their hands on the car so that the three would be in front of them and they "could see everybody." (Id. at 15:14-18; 18:11-14; 54:4-14.) Although his companions complied, Defendant resisted the officers' instructions, initially refusing to get him off the phone, and requiring Officer Calhoun to struggle with him to get his hands on the car. (See id. at 15:19-25; 18:5-9.) According to Officer Calhoun, Defendant was "moving his body all around" and "kept moving his arm off of the vehicle, down towards his side." (Id. at 51:21-25; 64:2-3.) Once or twice, if not more, Officer Calhoun reached out and put Defendant's hand back up on the car, and the two struggled. (Id. at 64:13-25.) In replacing Defendant's hand on the car, Officer Calhoun's arm brushed Defendant's waistband and he felt a gun concealed there. (Id. at 50:24 to 51:3; 56:3-8.) Officer Calhoun then handcuffed Defendant and removed the gun from his waistband, handing it to Officer Seifert. (Id. at 51:3-5; 56:16-18.) Thereafter, Officer Calhoun arrested Defendant and searched him, recovering from the front of his boxer shorts a dark plastic bag containing four clear knotted plastic bags filled with an off-white chunky substance that was later determined to be 70.74 grams of crack cocaine.[4] (Id. at 56:19-23;

---

[4]Defendant does not question the propriety of the arrest. Accordingly, we do not address it here.

73:15-23.)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Courts may exclude evidence from being admitted at trial if it was obtained during the course of an unreasonable search or seizure. Wong Sun v. United States, 371 U.S. 471, 484-85 (1963). Ordinarily, it is the defendant's burden to demonstrate that a search was unreasonable. United States v, Acosta, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992). However, when the police conduct a search or seizure without a warrant, "the burden shifts to the government to show that the search or seizure was reasonable." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). The burden of proof is preponderance of the evidence. United States v. Spencer, Crim. A. No. 02-788, 2003 WL 1594737, at *4 (E.D. Pa. Mar. 26, 2003).

A police officer may, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). Such a stop is commonly known as a "Terry stop." United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006). To make a showing of reasonable suspicion, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch of criminal activity.'" Wardlow, 528 U.S. at 123-24 (quoting Terry, 392 U.S. at 27). The court, in assessing reasonableness, must consider "the totality of the circumstances, which can include [the defendant's] location, a history of crime in the area, [the defendant's] nervous behavior and evasiveness, and [the officer's] 'commonsense judgments and inferences about human behavior.'" Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir. 2003) (quoting Wardlow, 528 U.S. at 124-25). In conjunction with a legitimate Terry stop, an officer may also

conduct a protective frisk of a defendant's outer clothing provided that the officer "observes unusual conduct which leads him to reasonably conclude in light of his experience that . . . the person with whom he is dealing may be armed and presently dangerous . . . ." Terry, 392 U.S. at 30.

Defendant argues that the weapon and controlled substances recovered in this case should be suppressed under the Fourth Amendment because the Terry stop conducted by Officers Seifert and Calhoun was not justified by a reasonable suspicion that Defendant was involved in criminal activity. In support of this argument, Defendant emphasizes that the officers did not observe him engaging in any criminal activity that evening and that he did not fit the description of either male in the Crime Bulletin, as he was only 23 years old at the time of the stop and weighed 295 pounds.

In evaluating whether an officer had reasonable suspicion to seize a suspect, the court must consider the facts known to the officer at the time that the seizure occurred. See Johnson, 332 F.3d at 206. Accordingly, the first step in a court's reasonable suspicion analysis is ascertaining the point in time at which the defendant was seized. Brown, 448 F.3d at 245. "A seizure occurs when there is either (a) 'a laying of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" Id. (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)). "Put another way, when a seizure is effected by even 'the slightest application of physical force,' it is immaterial whether the suspect yields to that force." Id. (quoting Hodari D., 499 U.S. at 625-26). "In contrast, if a suspect in the absence of physical force does not submit to an officer's show of authority, there is no seizure and no Fourth Amendment claim." Id. (citing Hodari D., 499 U.S. at 626-27).

In the instant case, the police officers did not lay their hands on Defendant or apply any physical force to restrain Defendant's movement until Defendant refused to stand with his hands on

the parked car. Moreover, we find that at no time before the officers ordered Defendant to place his hands on the car, did the officers exhibit a "show of authority" to which Defendant submitted.[5] Accordingly, at the earliest, the seizure of Defendant occurred when the officers ordered the three individuals to place their hands on the car, and Defendant moved to do so. Brown, 448 F.3d at 246 (recognizing that momentary compliance is not sufficient to consummate a seizure, but noting that a defendant demonstrates more than momentary compliance when he yields to an officer's authority by "turning to face [a] car and placing (or moving to place) his hands on the vehicle."); c.f. United States v. Valentine, 232 F.3d 350, 359 (3d Cir. 2000) (recognizing that momentary compliance with an officer's orders does not constitute a seizure).

Having ascertained the earliest point at which the seizure occurred, i.e., when Defendant moved to comply with the officers' order that he get on the car, we next consider whether the facts known to the officers at that point in time gave rise to a reasonable suspicion that criminal activity was afoot. We find that they did. As explained above, prior to the seizure, the officers had observed Defendant and his two companions walking around the 13th Street Corridor, an area recently beset by robberies and experiencing other problems with crime, stopping on two street corners and looking

---

[5]As explained above, the facts developed at the hearing are that the officers exited their car, identified themselves as police officers, and asked Defendant and his companions if they lived there. Officer Seifert also testified that he and Officer Calhoun essentially "sandwiched" the trio by approaching them from two different directions, which, in effect, "stopped" them. (N.T. 9/2/08, at 14:21-24.) We find, however, that this was not a seizure. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002). Indeed, "[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [and] ask for identification . . . provided they do not induce cooperation by coercive means." Id. at 201. Here, neither police officer drew a weapon upon exiting their vehicle (N.T. 9/2/08, at 23:15-17; 54:15-17), and there is no evidence that, at this point in the encounter, either officer did anything that could be interpreted as coercive.

around at the people passing by, as if they were casing people to rob. See Wardlow, 528 U.S. at 124 ("[T]hat the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis." (citing Adams v. Williams, 407 U.S. 143, 144, 147-148 (1972))); see also id. at 125 (noting that the Terry Court found that officers could detain individuals to resolve ambiguity regarding their lawful conduct, when those individuals were "pacing back and forth in front of a store, peering into the window and periodically conferring," which "suggested that the individuals were casing the store for a planned robbery" (citing Terry 392 U.S. at 2-6, 30)). Moreover, the three individuals in this case, at least at first glance and in nighttime lighting, bore a resemblance to the three suspects in recent robberies in the area, who were described in the Crime Bulletin.[6] Finally, when the officers approached Defendant and his two companions, planning to simply ask them their names and then forward those names to detectives investigating the crimes (N.T. 9/2/08, at 12:17-21; 53:20-23), Defendant and the female became irate, and Defendant resisted their request that he place his hands on the car. Based on all of these facts, we find that the officers possessed a reasonable, articulable suspicion that criminal activity was afoot and were justified in detaining Defendant in a Terry stop.

---

[6]Defendant argues that the individuals bore no resemblance to the crime suspects in the Crime Bulletin, noting that, among other things, he was much younger and heavier than both males in the Bulletin, and that neither he nor the other male had "afro hair." (N.T. 9/2/08, at 32:10 to 35:2; 40:25 to 41:19.) However, we find such dissimilarities to be inconsequential when (1) the officers were viewing the threesome in nighttime lighting, (2) the trio was acting in a suspicious manner, (3) the individuals were travelling in a distinct pack of three, just as the crime suspects had been, and (4) individually, the threesome bore at least some resemblance to the three crime suspects, e.g. the males were 5'10" and 5'11" ( see Hr'g Exs. D1 and D2), very similar to the two 5'11" males described in the Bulletin. Moreover, as we explain, the officers did not subject Defendants to a Terry stop based solely on the information set forth in the Bulletin. Rather, it was their knowledge of the Bulletin combined with their observations that prompted them to stop to ask the threesome questions, and it was not until they obtained further information by virtue of the trio's responses to their questions that they subjected Defendant to a Terry stop.

We also find that, at this point in time, the officers would have been justified in conducting a protective frisk of Defendant's outer clothing, as he was acting in a suspicious manner, waving his arms around and moving his hands towards his waistband. See Adams v. Williams, 407 U.S. 143, 146 (1972) ("The purpose of [a Terry] search . . . is to allow the officer to pursue his investigation without fear of violence . . . .") Nevertheless, the officer did not immediately pat down Defendant based on this information alone. Instead, neither officer frisked Defendant until after Officer Calhoun felt the gun in Defendant's waistband in his struggle to effectuate the Terry stop by getting Defendant to place his hands on the car. There can be no question that once he felt the gun, Officer Calhoun could "reasonably conclude . . .that . . . [Defendant] may be armed and presently dangerous," and, therefore, was fully justified in conducting a protective frisk and seizing the weapon. Terry, 392 U.S. at 30.

The Government takes the position that the more complete search that followed the recovery of the gun was a search incident to arrest, given that Officer Calhoun had placed Defendant under arrest after recovering the gun and then conducted the search pursuant to which he recovered the drugs. It is well-established that an officer may conduct a search incident to arrest, and Defendant has not challenged the propriety of the arrest here. Chimel v. California, 395 U.S. 752, 762-63 (1969) ("When an arrest is made, . . . it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."). Rather,

Defendant argues only that the initial Terry stop was not based on reasonable suspicion. As we reject this argument for the reasons stated above, we deny Defendant's motion to suppress both the gun and the drugs.

BY THE COURT:

/s/ John R. Padova, J.

John R. Padova, J.